# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 6, 2011

## STATE OF TENNESSEE v. JIMMY DALE QUALLS

**Direct Appeal from the Circuit Court for Hardeman County**
**No. CC-10-CR-88      J. Weber McGraw, Judge**

---

**No. W2010-02523-CCA-R3-CD  -  Filed March 14, 2012**

---

A Hardeman County Circuit Court Jury convicted the appellant, Jimmy Dale Qualls, of thirty-seven counts of sexual battery by an authority figure and one count of incest, Class C felonies, and the trial court sentenced him to an effective sentence of thirty-two years in confinement. On appeal, the appellant contends that he is entitled to a new trial because the State failed to make an election of offenses for the sexual battery convictions. The State acknowledges that the trial court committed reversible error. We agree with the appellant and the State that the appellant's convictions for sexual battery by an authority figure must be reversed because the State failed to make an election of offenses. The case is remanded to the trial court for a new trial for those offenses. The appellant's conviction for incest is affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court are Affirmed in Part and Reversed in Part, and the Case is Remanded.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which ALAN E. GLENN, and JEFFREY S. BIVINS, JJ., joined.

Shana Johnson and Parker Dixon (at trial), Somerville, Tennessee, James O. Martin, III, (on appeal), Nashville, Tennessee, for the appellant, Jimmy Dale Qualls.

Robert E. Cooper, Jr., Attorney General and Reporter; Clarence E. Lutz, Assistant Attorney General; D. Michael Dunavant, District Attorney General; and Joe L. VanDyke and Lisa Borden, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### I.  Factual Background

The record reflects that in May 2010, the Hardeman County Grand Jury indicted the appellant for counts one through thirty-seven, sexual battery by an authority figure, and count thirty-eight, incest. The victim in the first eight counts was the appellant's daughter, E.Q.,[1] and each count alleged a different date for the offense. Specifically, the grand jury returned one count for every month from January 2007 to August 2007. The victim in counts nine through thirty-seven was the appellant's daughter, E.Q.2, and each count again alleged a different date for the offense. Specifically, the grand jury returned one count for every month from January 2007 to May 2009. The victim in count thirty-eight, alleging incest between March 10, 1995, and May 30, 1999, was J.Q., the appellant's wife and the mother of E.Q. and E.Q.2.

At trial, thirty-nine-year-old J.Q. testified that the appellant's name used to be Kenneth Dewayne Parrack. When J.Q. was five years old, the appellant married her mother. He adopted J.Q. and her younger sister in 1984. At that time, J.Q.'s last name also became Parrack. She said that her mother did not want her and her sister to be afraid of the appellant, so "she let us touch him and put our mouth on him and stuff like that." She said that she did not perform oral sex on the appellant but that she kissed and felt his private parts. When J.Q. was thirteen years old, she began having sexual intercourse with the appellant, and when she was fourteen or fifteen years old, he began sleeping with her in her bedroom. She acknowledged that she and the appellant were living as husband and wife. J.Q.'s mother remained in the home but slept in her own bedroom. When J.Q. was sixteen years old, her mother moved out of the house. J.Q. married the appellant in 1995, and they had three daughters and one son. She said that their daughter, E.Q., was twenty-one-years-old at the time of trial, and that their daughter, E.Q.2, was sixteen years old. She said that E.Q.2 currently was living with J.Q.'s sister in Arkansas because of "the abuse that we all suffered and I didn't protect them from it, the Judge took them away from me as well as him . . . because there was the abuse that I knew or should have known about." She said that she and the appellant stopped having sexual intercourse several years before trial but that they had oral sex occasionally until he was arrested in this case.

On cross-examination, J.Q. testified that while their children were living with her and the appellant, the family had Bible study regularly and "would have supper at the table and talk." She said that at some point, her son left home and that the family had a meeting with him "to air things out so that he could start coming back around with a little more peace and less stress around everybody." She said that E.Q. made "A's" in school and E.Q.2 made "straight A's." However, J.Q. had not had much contact with them since the children had been removed from her home.

---

[1]To protect the identities of the victims, we will refer to them by their initials. Also, because two of the victims have first names that start with the letter E, we will refer to them as E.Q. and E.Q.2 for clarity.

E.Q. testified that she was born on September 1, 1989, that she currently lived in Arkansas, and that she moved to Arkansas three days before the appellant was arrested in this case. She said that she lived with her mother and the appellant for nineteen years and that she and the appellant "never got along at all." She said that she was a senior in high school in January 2007 and that the appellant began asking her, "'Can I pinch your p****?'" She said that he would "poke us like right up where the butt is or grab our butts or things like that" and that the appellant's behavior made her uncomfortable. The State asked her when the appellant would "do this," and she answered, "There really wasn't, you know, a specific time that he would do it. I'd be in the kitchen putting something in the microwave and he would come up behind me and, you know, fiddle right there at my butt." However, she stated, "It was something that I experienced every month. He wouldn't necessarily do it every day." E.Q. said that if she expressed discomfort with the appellant's behavior, he accused her of being "melodramatic" and made her feel "like a piece of crap." She explained, "I got to the point where I just . . . I had to put on a happy face and if I didn't, I'd get yelled at."

E.Q. testified that the appellant never actually pinched her vagina but that he would pinch her leg or the side of her leg over her underwear. She demonstrated for the jury where the appellant touched her. She said that they had some "good weeks" but that "I don't remember ever a month going by where there wasn't some kind of a fight, a whipping, a hit, a touch or anything like that." She said the appellant claimed he was trying to make her aware of parts of her body that people should not touch. She said that she remembered the abuse occurring in January 2007 and that she became eighteen on September 1, 2007.

E.Q.2 testified that she was born on November 30, 1993, and that she lived with her parents until 2009. Regarding her relationship with the appellant, she explained that "I was more the favorite" and "sort of went my way around any problem just to not have any conflict." She said that from 2002 to 2008, she and her sisters bought new bras about every other month and that the appellant "would feel on the breast area to make sure that the bra fit." She said the appellant also "would come up and like he would touch our butts, like smack our butts, and then he would take his finger, like when we would bend down or just turn around behind him and wiggle his finger on our private part." She said that the appellant touched her vagina over her clothes "probably like twice a week" and that he touched her from 2002 until she was taken away from her parents in May 2009. E.Q.2 said that when she was ten years old, the appellant began asking her and her two sisters, "'Can I pinch your p****?'" She said that he asked them "[p]robably once per month" and that he continued to do so until 2007. She said she never told the appellant to stop because "I was scared because my sister asked him one time to stop touching her butt and she got yelled at and in big trouble and like he hit her and so I sort of learned from that that if I had said something that it would just turn right on me." Finally, she said that the appellant would watch her and

her sisters undress to get into the shower and that he would be in the bathroom when they got out of the shower.

On cross-examination, E.Q.2 acknowledged that the appellant initiated family meetings. At first, she denied being upset about her lack of freedom with her parents. However, she acknowledged talking with an interviewer at the Carl Perkins Center about her "freedom situation" and that the appellant limited her access to the telephone and internet. She also acknowledged telling the interviewer at the Carl Perkins Center that the appellant began touching her vagina over her clothes when she was thirteen years old, not nine years old. Before the appellant was arrested, E.Q.2 talked with her sister about moving out of the house and gave the appellant an ultimatum: either let E.Q.2 live somewhere else or she and her sister were going to call the police. She acknowledged that she never told her teachers or schoolmates about the abuse.

On redirect examination, E.Q.2 testified that she wanted to move out of her parents home "[b]ecause since my mom and my sister were . . . out working, he didn't have them to beat up on so he started in on me 'cause I was the oldest left." She said her mother knew about the abuse but did nothing to stop it.

The jury convicted the appellant as charged of thirty-seven counts of aggravated sexual battery by an authority figure and one count of incest. After a sentencing hearing, the trial court sentenced him as a Range I, standard offender to four years on each count and ordered that the sentences be served consecutively for a total effective sentence of one hundred fifty-two years. During the motion for new trial hearing, the trial court reconsidered the length of the appellant's effective sentence and modified it to thirty-two years.

## II. Analysis

The appellant raises various issues regarding his convictions. However, all of his claims are related to the State's failure to make an election of offenses for the sexual battery convictions. The State acknowledges that its failure to make an election of offenses constitutes reversible error. We agree with the appellant and the State.

When an indictment charges that a number of sexual offenses occurred over a span of time, the State may introduce evidence of any unlawful sexual activity between the defendant and the victim allegedly occurring during that span of time. State v. Rickman, 876 S.W.2d 824, 828-829 (Tenn. 1994). However, at the conclusion of its case-in-chief, the State must elect the particular incident for which a conviction is being sought. See Burlison v. State, 501 S.W.2d 801, 803 (Tenn. 1973); see also State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001). This requirement of election serves several purposes: (1) it enables the

defendant to prepare for the specific charge; (2) it protects a defendant against double jeopardy; (3) it ensures the jurors' deliberation over and their return of a verdict based upon the same offense; (4) it enables the trial judge to review the weight of the evidence in its role as the thirteenth juror; and (5) it enables an appellate court to review the legal sufficiency of the evidence. State v. Brown, 992 S.W.2d 389, 391 (Tenn. 1991).

Recognizing the practical difficulties present in applying the election requirement in cases of child sexual abuse, our supreme court has granted that "the state is not required to identify the particular date of the chosen offense. . . . [A] particular offense can often be identified without a date." State v. Shelton, 851 S.W.2d 134, 137 (Tenn. 1993); see Brown, 992 S.W.2d at 392 (providing that "[t]he State is not required to prove that an offense was committed on a specific date unless the date is an element of the crime or essential to proving the offense."). As the court explained,

> If, for example, the evidence indicates various types of abuse, the prosecution may identify a particular type of abuse and elect that offense. Moreover, when recalling an assault, a child may be able to describe unique surroundings or circumstances that help to identify an incident. The child may be able to identify an assault with reference to a meaningful event in his or her life, such as the beginning of school, a birthday, or a relative's visit. Any description that will identify the prosecuted offense for the jury is sufficient. . . . [T]he trial court should bear in mind that the purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask a conviction, then the court cannot be assured of a unanimous decision.

Shelton, 851 S.W.2d at 138.

However, in Tidwell v. State, 922 S.W.2d 497, 501 (Tenn. 1996), the State argued that, when a victim is unable to recount any specifics about multiple incidents of abuse except that the defendant engaged her in sexual intercourse on numerous occasions, "'jury unanimity is attained . . . because, although the jury may not be able to distinguish between the various acts, it is certainly capable of unanimously agreeing that they took place in the number and manner described.'" (Emphasis added.) The Tennessee Supreme Court specifically rejected this argument. Tidwell, 922 S.W.2d at 501. Moreover, the court held, "A defendant's right to a unanimous verdict before imposition of conviction requires the trial court to take precautions to ensure that the jury deliberates over the particular charged

-5-

offense, instead of assembling a 'patchwork verdict' based on the different offenses in evidence." Id.

Turning to the instant case, we initially note that the appellant never requested an election of offenses. However, "the election requirement is a responsibility of the trial court and the prosecution and, therefore, does not depend on a specific request by a defendant." State v. Kendrick, 38 S.W.3d 566, 569 (Tenn. 2001).

E.Q. testified that in January 2007 , when she was seventeen years old, the appellant began asking her, "'Can I pinch your p****?'" She said that he also would "poke us like right up where the butt is" and that the abuse occurred every month. E.Q.2 testified that the appellant touched her vaginal area over her clothes "[p]robably like twice a week" from 2002 to May 2009. However, neither victim provided a single detail that differentiated one offense from another.

The facts in this case are similar to the facts in Tidwell. In that case, the defendant was indicted for fourteen counts each of rape, statutory rape, incest, and contributing to the delinquency of a minor for engaging in sexual activity with his thirteen-year-old daughter once per month for fourteen months. 922 S.W.2d at 499 n.2. At trial, the victim testified that the sexual activity actually occurred about once per week during that time period. Id. For all but two of the rapes, she was unable to "ascribe a particular act to a specific time, whether by date or other reference." Id. The jury convicted the appellant of forty-two counts: fourteen counts each of rape, incest, and contributing to the delinquency of a minor. Id. at 498-99. In explaining why the State should have made an election of offenses, our supreme court stated,

> The State apparently concludes that "jury unanimity is attained in such cases because, although the jury may not be able to distinguish between the various acts, it is certainly capable of unanimously agreeing that they took place in the number and manner described."
>
> This approach, in our view, is akin to a "grab-bag" theory of justice. To illustrate the operation of this theory, in any given case the State could present proof on as many offenses within the alleged period as it chose. Because all such offenses will have been "proven," the jury may, in effect, reach into the brimming bag of offenses and pull out one for each count. Even when done by this method, the argument goes, each offense will have been proven beyond a reasonable doubt. We acknowledge

that the illustration is an extreme one, but we think it makes the
point: such an approach is contrary to our law.

Id. at 501.  In light of the foregoing, we conclude that the trial court committed reversible
error by failing to require the State to make an election of offenses.

### III.  Conclusion

Based upon the record and the parties' briefs, the appellant's convictions for sexual
battery by an authority figure are reversed, and the case is remanded to the trial court for a
new trial as to those charges.  The appellant's conviction for incest in count thirty-eight is
affirmed.

_____
NORMA McGEE OGLE, JUDGE